UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) NO. 11-cr-30016-MAP |
| | ) |
| JEFFREY STREAM, LAURENCE | ) |
| VINCENT, & ISRAEL SCHEPPS, | ) |
| Defendants | ) |

MEMORANDUM AND ORDER REGARDING
CALCULATION OF LOSS

April 18, 2012

PONSOR, U.S.D.J.

I. INTRODUCTION

On June 9, 2011, Defendants Jeffrey Stream, Laurence Vincent, and Israel Schepps pled guilty to conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349. Under the U.S. Sentencing Guidelines, the appropriate sentencing range for fraud offenses depends, in part, on the amount of loss caused by defendants' conduct. U.S.S.G. § 2B1.1(b)(1). On February 28, 2012, the court held a hearing to determine the amount of loss and received supplemental memoranda through March 30, 2012.

Defendants have conceded that the loss due to their fraud totaled at least $2.5 million, which has the effect of

increasing their offense levels by eighteen points.  The
government has argued that the loss amount was at least $7
million, which would increase the offense levels by twenty
points.  U.S.S.G. § 2B1.1(b)(1) (J) and (K).  For the
following reasons, the court will adopt the government's
calculation and find that total loss was in excess of $8.7
million.

## II. BACKGROUND

On December 22, 2005, Defendants' company, Mastex,
obtained two revolving lines of credit and an equipment loan
from TD Bank.  The lines of credit were secured by the
company's assets, accounts receivable, and inventory ("the
borrowing base").  The equipment loan was secured by the
company's equipment.  Defendants admit that, between 2006
and February 2009, they fraudulently inflated their
borrowing base by approximately $8.1 million.  When the
fraud was discovered in February 2009, the total outstanding
balance on all three loans was $11,135,218.

TD Bank took control of Mastex in February 2009.  It
continued to collect accounts receivable and sold the
company's equipment and inventory.  Between February 2009

2

and January 2011, TD Bank collected $2,631,293 in accounts receivable and inventory and equipment sales.

### III. DISCUSSION

Under the Sentencing Guidelines, "loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). The parties agree that actual loss is the relevant calculation in this case. Actual loss is "the reasonably foreseeable pecuniary harm that resulted from the offense." Id. § 2B1.1 cmt. n.3(A)(I). In cases involving pledged collateral, the calculation of actual loss must be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." Id. § 2B1.1 cmt. n.3(E)(ii).

Under this analysis, the government argues that the total loss suffered by TD Bank was $8,759,286, which is equal to the loan amount outstanding as of February 2009 minus the amount recovered by the bank. Other courts have employed similar formulas to calculate loss. See United States v. Rubashkin, 655 F.3d 849, 868 (8th Cir. 2011)

("[L]oss is simply the unpaid balance on a fraudulently obtained loan, less the realized or fair market value of any pledged collateral."); United States v. Turk, 626 F.3d 743, 750 (2d Cir. 2010); United States v. Serfling, 504 F.3d 672, 679 (7th Cir. 2007).

Defendants disagree with the government's calculation, noting that "[l]osses from causes other than fraud must be excluded from the loss calculation." United States v. Ebbers, 458 F.3d 110, 128 (2d Cir. 2006). They contend that the government's calculation of loss unfairly includes losses caused by factors outside of Defendants' control, in particular the disastrous economic downturn in 2007 and 2008 that severely affected Mastex's business. According to Defendants, taking these market factors into account and subtracting losses not caused by Defendants' fraud produces a total loss amount that drops below $7 million.

Defendants' expert witness, Dr. Craig L. Moore, calculated the total loss attributable to Defendants' fraud at no more than slightly over $3 million. In a written report and during testimony at a hearing on February 28, 2012, Dr. Moore took the position that, although Defendants

4

committed fraud as early as 2006, by the end of 2007 they had purchased enough inventory so that the disclosures made to the bank, originally fraudulent, had been "squared up" with the actual inventory on hand.  Thus, he contended, by the end of 2007, the bank had an accurate picture of where it stood, at least with regard to the collateralized inventory.[1]

Assuming that the bank was receiving accurate information as of December 2007, Dr. Moore argued that any losses the bank was exposed to at that time were entirely due to market forces, and not to fraud on the part of Defendants.  Dr. Moore then hypothecated that, if Defendants had not resumed their fraud in the beginning of 2008, Mastex

---

[1] The government does not disagree with Moore's contentions regarding the "squaring up" of inventory at the end of 2007, but offers two additional points. First, in contrast to the inventory, the fraudulent misrepresentations regarding accounts receivable were not "squared up" as of the end of 2007, but "persisted and escalated."  (Dkt. No. 22 at 6.)  Second, at oral argument, the government suggested that the purchases of inventory, made to insure that at least as of December 2007 the actual inventory was in line with what Defendants were telling the bank, were never recorded as liabilities on Mastex's books.  Defendants do not address these arguments directly, and it is not necessary for the court to resolve them for purposes of this memorandum.

would have gone bankrupt by the end of the first quarter of that year because of the accelerating economic downturn. Mastex's hypothesized collapse in 2008 would have caused loss to the bank based on its loan extensions, but no loss due to fraud.[2]

Dr. Moore argued, in substance, that the proper amount of loss for sentencing purposes is equal to the amount of credit extended after December 31, 2007 based on Defendants' resumption of their fraud in 2008. Dr. Moore did not include in his loss calculations any loss based on the equipment loan, because Defendants made no false representations regarding equipment. Dr. Moore also did not include any loss based on one of the lines of credit (worth two million dollars) because, he argued, it was a revolving debt that did not vary with the value of the borrowing base.

The proper loss amount then, according to Defendants, is the difference between what the bank _actually_ lost after taking control of Mastex in 2009 and what the bank hypothetically _would_ have lost in 2008, if Defendants had

---

[2] As noted, the government disputes that the Bank would not have suffered any loss due to fraud at the end of 2007.

been truthful then and Mastex had gone bankrupt. To put it crudely, Defendants in effect contend that Mastex was toast by the end of 2007; the bank was going to take a substantial hit on its loans quite apart from any fraud. It is unfair, they contend, to add this inevitable economy-driven loss to the fraud-based loss in calculating the technical "loss" for sentencing purposes.

While this argument has some theoretical appeal, it requires the court to engage in a high degree of speculation. Perhaps as a result, courts in cases like this one have avoided taking adverse economic conditions into account. See Rubashkin, 655 F.3d at 868. Here, as noted, the government disputes Defendants' basic assumption that the victim bank was getting an honest picture of Mastex's financial circumstances at the end of 2007. More importantly, no one knows, and no one now can know, exactly what would have happened with Mastex, or how the company's fate would have affected the victim bank's exposure, if Defendants had been complete and truthful throughout their relationship to their lender. What is clear is that by 2009, after liquidating its collateral, the bank ended up

7

with $8.1 million in loan advances that it had been told were secured by accounts receivable and inventory that, as it turned out, did not exist.  The court will base its loss calculation on reality, not hypothesis or speculation.

Defendants argue that, at the very least, the economic downturn reduced the amount TD Bank recovered through the sale of collateral, and the court should take this diminished offset into consideration.  To this argument there are two responses.  First, "a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct."  Turk, 626 F.3d at 750 (internal citation omitted).  Second, it was Defendants' misrepresentations that enticed the bank to continue making loan advances as the economic landscape darkened and, as a result, placed the bank in a position of having to liquidate its collateral in an adverse economic climate.  It would be unfair to permit Defendants to benefit from their own misconduct in this way.

It is also improper to limit loss, as Defendants suggest, solely to the amount actually advanced on

fraudulent collateral. See Rubashkin, 655 F.3d at 867-68
(rejecting the defendant's argument that loss is the
difference between what the bank would have lent without the
inflated collateral and what it actually lent). In this
case, this approach would deduct the loss related to the
equipment loan, since no fraud is alleged by the government
in connection with this loan, and the loss related to one
line of credit, which Defendants' expert argued was not
dependent on the borrowing base. Such a limitation fails,
however, to consider the impact of the inflated collateral
and accounts receivable on the bank's decision to continue
to loan _any_ money to Mastex. Had Mastex not inflated its
borrowing base, it is likely the bank would have refused to
make _any_ further loans.

## IV. CONCLUSION

In the end, the only solid ground to calculate loss for
purposes of sentencing is the outstanding loan amount as of
February 2009, minus what the bank received through accounts
receivable and the sale of inventory and equipment. For the
foregoing reasons, the court determines that for sentencing
purposes the total loss that resulted from Defendants' fraud

exceeded $8.7 million.  The result is that, with acceptance of responsibility, Defendants' total offense level for purposes of the advisory sentencing guidelines will be 23.[3]

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

---

[3] This conclusion does not, of course, relieve the court of the responsibility to consider the historically sharp economic downturn, and perhaps other factors, in determining whether a variance from the applicable advisory guideline range is appropriate.